CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
February 10, 2026

LAURA A. AUSTIN, CLERK
BY:  s/ D. AUDIA
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Joseph L. Hatter, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00045 |
| | ) | |
| David W. Hill *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

The claims in this suit arise from Defendant David W. Wilson's late-night traffic stop and five-hour detention of Plaintiff Joseph L. Hatter. Wilson, a deputy sheriff, placed Hatter under arrest for driving under the influence of alcohol based on observations of Hatter's eye movements, odor of alcohol, admission to drinking beer earlier that day, "walk-and-turn" field sobriety test results, and refusal to complete further field sobriety testing. Hatter's breathalyzer test, administered at the sheriff's office just an hour after the initial stop, returned a value of 0.00 blood alcohol content. However, Wilson kept Hatter in custody. Wilson then sought and obtained a search warrant authorizing a blood draw to test for various drugs. After transporting Hatter to and from the hospital for the blood sample, Wilson applied for an arrest warrant for driving under the influence of drugs. When the magistrate denied Wilson's arrest warrant application, Wilson released Hatter from custody without any charges.

This matter is before the court on Defendants David W. Hill, David W. Wilson, and the Nelson County Sheriff's Office's motion to dismiss Plaintiff Joseph L. Hatter's amended

complaint. (Dkt. 15.) In his amended complaint, Hatter alleges that the Defendants violated his Fourth and Fourteenth Amendment constitutional rights. (Dkt. 14.) He also asserts a claim of false imprisonment under state law. (*Id.*) Defendants move to dismiss all six counts. (Dkts. 15, 16.) For the following reasons, the court will grant in part and deny in part Defendants' motion to dismiss.

## I.    Background

### A. Factual History[1]

At around 10:35 p.m. on June 24, 2023, Defendant Wilson, a Nelson County Sheriff's Deputy, initiated a traffic stop of Plaintiff Hatter "for the suspicion of DUI" in Nellysford, Virginia. (Aff. for Search Warrant at 2 (Dkt. 14-2); Am. Compl. ¶¶ 6, 8–10 (Dkt. 14).) Hatter had spent that day in Nelson County "assisting his family members with various household and construction projects." (Am. Compl. ¶ 8.) He was driving home to Charlottesville when Wilson pulled him over. (*Id.* ¶ 10.) In his search warrant affidavit, Wilson stated that he could smell "the odor of an alcoholic beverage coming off [Hatter's] person" when he approached Hatter. (Aff. for Search Warrant at 2; Am. Compl. ¶ 11.) Wilson also noticed nystagmus, or involuntary eye movements that may indicate a person has been drinking, in each of Hatter's eyes. (Aff. for Search Warrant at 2; Am. Compl. ¶ 12.) Hatter told Wilson that he drank seven beers while with his family that day. (Aff. for Search Warrant at 2; Am. Compl. ¶ 13.) However, he specified that he drank the last beer about five hours prior—around 5:00 p.m.

---

[1] The facts in this section are taken from Hatter's amended complaint and the attached exhibits. The court accepts the facts alleged in the amended complaint and supporting exhibits as true when resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

(*Id.*)  Hatter also noted that he had taken a nap before driving back to Charlottesville.  (Am. Compl. ¶ 13.)

Wilson asked Hatter to complete a series of roadside sobriety tests, to which Hatter initially agreed.  (*Id.* ¶ 14.)  However, Wilson's affidavit alleges that Hatter "did not complete the walk and turn as instructed."  (Aff. for Search Warrant at 2.)  Specifically, Wilson describes that "Hatter lost balance on the first set of nine steps keeping his arms elevated to maintain balance on the second set of nine steps."  (*Id.*)  After that, Wilson claims, Hatter refused to complete any additional field sobriety tests.  (*Id.*)  Hatter clarifies that he declined because "did not feel comfortable performing the walk and turn in the footwear he was wearing" and "had a knee injury that may [have] impact[ed] his ability to perform field sobriety tests."  (Am. Compl. ¶ 29.)  Hatter also refused to take a roadside Preliminary Breath Test ("PBT") but agreed to take the breathalyzer test at the police station.  (Aff. for Search Warrant at 2; Am. Compl. ¶¶ 15–16.)

Thereafter, Wilson placed Hatter under arrest on suspicion of driving under the influence ("DUI") of alcohol.  (Aff. for Search Warrant at 2; Am. Compl. ¶ 17.)  Wilson then searched Hatter's vehicle.  (Am. Compl. ¶ 18.)  When the search did not uncover any illegal or incriminating items, Wilson transported Hatter to the Nelson County Sheriff's Office for the breathalyzer test.  (*Id.* ¶¶ 18–19.)  The test results showed that, as of 11:45 p.m., Hatter had a blood alcohol content of 0.00.  (*Id.* ¶¶ 20–21; Dkt. 41-1 at 1.)

Wilson continued to detain Hatter in a holding cell following the breathalyzer test.  (Am. Compl. ¶¶ 21–22.)  When Hatter asked why he was still detained, Wilson responded that it was "because Deputy Wilson could not have Mr. Hatter following him around the office."

(*Id.* ¶¶ 22–23.)  Wilson then applied for a search warrant to obtain a sample of Hatter's blood for drug testing, in which he stated that he "suspect[ed] that [Hatter] may be under the influence of a controlled substance or other forms of alcohol."  (Aff. for Search Warrant at 2; Am. Compl. ¶¶ 24–25.)

At 12:35 a.m. on June 25, 2023, Wilson submitted his sworn affidavit alongside the search warrant application to a magistrate judge in the Nelson County Circuit Court.  (Aff. for Search Warrant at 1–2.)  Wilson included the following "material facts constituting probable cause that the search should be made" in the application:

> On 6/24/23, approx. 2200 hours, I Deputy Wilson investigated a Traffic stop
> for the suspicion of DUI.  Upon initial contact with the driver, I had the odor
> of an alcoholic beverage coming off his person.  Hatter states he had 7 beers
> and the last one was approx. 1700 hours.  Through out [sic] the traffic stop, I
> Conducted [field sobriety tests] with the driver Joseph Lewis Hatter.  Hatter
> showed nystagmus in each eye.  Hatter then did not complete the walk and turn
> as instructed.  Hatter lost balance on the first set of nine steps keeping his arms
> elevated to maintain balance on the second set of nine steps.  Hatter then
> refused to complete any further Field Sobriety test.  Hatter refused P.B.T. on
> scene.  Hatter was then placed under arrest for DUI.  At approx. 2345, [sic] the
> certificate of analysis results were [sic] a 0.00.  I suspect that he may be under
> the influence of a controlled substance or other forms of alcohol.

(Aff. for Search Warrant at 2.)  The judge granted the application and issued the search warrant.  (Am. Compl. ¶ 31.)

Thereafter, Wilson transported Hatter to Lynchburg General Hospital, where at approximately 1:30 a.m., providers extracted a vial of Hatter's blood and sent it to be tested for alcohol and various drugs.  (Am. Compl. ¶ 31; *see* Dkt. 14-3.)  During the drive from the sheriff's office to the hospital, Wilson answered a phone call.  (Am. Compl. ¶ 32.)  Hatter believes the caller was "a supervisor of Deputy Wilson, potentially Sheriff Hill."  (*Id.*)  Hill served as the Nelson County Sheriff at the time.  (*Id.* ¶ 5.)  Hatter heard Wilson during the

phone conversation, in which Wilson explained Hatter's detention and how Wilson was taking Hatter to the hospital for a blood draw. (*Id.* ¶ 33.) Hatter also heard Wilson state that "he intended to charge Mr. Hatter with driving under the influence of drugs." (*Id.*)

Once the blood draw procedure was finished, Wilson drove Hatter back to the sheriff's office and placed him in the holding cell. (*Id.* ¶ 34.) Hatter, who had "experience as a law enforcement officer," protested the fact that he was still detained and asserted that Wilson "was required to wait for the results of the blood draw to be produced before he could attempt to charge Hatter with driving under the influence of drugs." (*Id.* ¶ 35.) Wilson disregarded Hatter's comments, and Hatter remained in custody. (*Id.* ¶ 36.)

In pursuit of an arrest warrant for Hatter for driving under the influence of drugs ("DUID"), Wilson then testified before Magistrate M.J. Fleshman "by video link." (*Id.*) Hatter was given a chance to speak directly to Magistrate Fleshman. (*Id.* ¶ 37.) Hatter argued that Wilson could not arrest him for DUID without the results of the blood draw, which had not yet been produced. (*Id.*) Magistrate Fleshman concluded that there was no probable cause to justify issuing the arrest warrant and denied Wilson's request. (*Id.* ¶ 38.)

At around 3:30 a.m. on June 25, Wilson released Hatter from custody and returned his personal property. (*Id.* ¶ 39.) Wilson did not transport Hatter back to his vehicle, nor did he provide any other assistance for Hatter to return home. (*Id.* ¶ 40.) Wilson also declined Hatter's request to provide a copy of the search warrant affidavit or completed return. (*Id.* ¶ 41.) The following month, the Virginia Department of Forensic Science produced the Certificate of Analysis for Hatter's blood draw. (*Id.* ¶ 42; Dkt. 14-3 at 1.) It confirmed that

no blood alcohol, "drugs[,] and/or drug classes were detected." (Dkt. 14-3 at 1.) Hatter was

never charged with any crime or traffic offense following this Certificate. (Am. Compl. ¶ 43.)

On June 27, 2023, Hatter's counsel sent a preservation request addressed to "Sheriff

Hill." (*Id.* ¶ 53; Dkt. 14-4.) The letter broadly described Wilson's detention of Hatter

following the traffic stop, warned Hill of potential litigation, and requested that Hill preserve

all relevant information in his possession. (*Id.*) Upon Hatter's information and belief, Hill did

not discipline Wilson following his notification of the incident. (Am. Compl. ¶ 54.)

Hatter further believes that Hill, "or someone on his behalf," contacted the

Charlottesville Police Department ("CPD"), the Wintergreen Property Owners' Association

("WPOA"), and Wintergreen Police Department ("WPD") with information concerning

Hatter's arrest and detention. (*Id.* ¶¶ 55–56.) At the time, Hatter was employed by CPD and

was "actively engaged in the application and vetting process" for a position with WPD. (*Id.*

¶¶ 55, 60.) Specifically, upon Hatter's information and belief, Hill informed WPOA and WPD

that if Hatter were to work at WPD, he would not have access to the Nelson County Sheriff's

Office incident report system, referred to as "CAD." (*Id.* ¶¶ 57, 61.) WPD uses CAD in its

work, and access to CAD "would be a vital and important part" of Hatter's WPD position.

(*Id.* ¶ 61.) After Hill lost reelection for Nelson County Sheriff in November 2023, Hatter was

hired by WPD. (*Id.* ¶¶ 62–63.) As of July 2025, when Hatter filed the amended complaint, he

still worked for WPD. (*Id.* ¶ 63.)

Several months after the arrest and detention, on September 14, 2023, Hatter spoke to

the Commonwealth Attorney for Nelson County, Daniel L. Rutherford, at the

Commonwealth Attorney's Office. (*Id.* ¶¶ 81–82.) As Commonwealth Attorney, Rutherford

"works closely with" the Nelson County Sheriff's Office.  (*Id.* ¶ 91.)  When Hatter asked Rutherford if "there were some issues he knew of with respect to the Nelson County Sheriff's Office," Rutherford answered that "some issues is an understatement of the century."  (*Id.* ¶¶ 83–84.)  Rutherford noted that Wilson "should not have attempted to charge Mr. Hatter with driving under the influence of drugs, stating 'you have to get something' to demonstrate probable cause of drug use."  (*Id.* ¶ 87.)  Rutherford also agreed with Hatter that Wilson should have waited until the blood work had returned before attempting to charge Hatter with DUID.  (*Id.* ¶ 88.)  In response to Hatter's question as to whether there was "any supervision" in the sheriff's office run by Hill, Rutherford responded, "[N]one. None. Yeah, it's bad."  (*Id.* ¶¶ 89–90.)

Finally, Hatter includes in his amended complaint a series of allegations regarding another traffic stop initiated by Wilson.  (*Id.* ¶¶ 64–80.)  On September 9, 2023—a little over two months after Hatter's arrest—Wilson conducted a traffic stop of Jessica Ligon.  (*Id.* ¶¶ 64–65.)  Ligon was, at the time, running for election to the Nelson County Board of Supervisors.  (*Id.* ¶ 66.)  She later won the election and was serving in her board position at the time Hatter's amended complaint was filed.  (*Id.* ¶ 67.)

Hatter states that, after Wilson pulled Ligon over, he accused her of having nystagmus of the eye.  (*Id.* ¶ 68.)  Wilson performed three PBTs on Ligon, each of which yielded a result of 0.08 blood alcohol content.  (*Id.* ¶¶ 69–70.)  Hatter claims that Wilson had probable cause to arrest Ligon for driving under the influence of alcohol and for transporting an unsecured child under the age of seventeen pursuant to Virginia state law.  (*Id.* ¶¶ 70–71.)  However, Wilson neither arrested her nor sought a warrant to obtain a blood sample.  (*Id.* ¶¶ 72–73.)

Upon Hatter's knowledge, information, and belief, Wilson did not accuse Ligon of DUID during the traffic stop. (*Id.* ¶ 74.) Instead, regarding her nystagmus, he stated that "I have seen worse, a lot, lot worse, so I don't feel that I have enough to place you under arrest for DUI." (*Id.* ¶ 75.) He released Ligon on a summons for speeding. (*Id.* ¶ 77.)

### B. Procedural History

On June 2, 2025, Hatter filed a complaint against Defendants Hill, Wilson, and the Nelson County Sheriff's Office in this court. (Dkt. 1.) Defendants Hill and Nelson County Sheriff's Office filed a motion to dismiss for failure to state a claim on June 30. (Dkt. 8.) Two weeks later, on July 14, Hill filed an amended complaint as a matter of right against the same three Defendants. (Am. Compl.)

The amended complaint seeks to hold the Defendants jointly and severally liable for six causes of action. (*Id.* ¶¶ 94–201.) Count I alleges a 28 U.S.C. § 1983 claim that Defendant Wilson violated the Fourth Amendment's prohibition on unlawful seizures. (*Id.* ¶¶ 94–108.) Count II alleges another § 1983 Fourth Amendment claim against Wilson for conducting an unreasonable search. (*Id.* ¶¶ 109–19.) Count III alleges that Wilson violated Hatter's substantive due process rights. (*Id.* ¶¶ 120–28.) Count IV alleges a § 1983 claim of "supervisory liability" against Hill. (*Id.* ¶¶ 129–59.) Count V alleges § 1983 claims of "municipal liability" against Hill and Nelson County Sheriff's Office. (*Id.* ¶¶ 160–88.) Count VI alleges a state law claim of false imprisonment against Wilson. (*Id.* ¶¶ 189–201.) Hatter asks for a total of one million dollars in compensatory damages and one million dollars in punitive damages. (*Id.* at 29.)

All three Defendants filed a joint motion to dismiss the amended complaint pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(6), and 17 on July 28, 2025. (Dkt. 15.) Hatter responded in opposition to the motion on August 11. (Pl.'s Br. (Dkt. 17).) In this opposition brief, Hatter states that he "will not oppose" dismissing (1) the Nelson County Sheriff's Office as a defendant, (2) Count III, his substantive due process claim, and (3) all claims brought against Wilson and Hill in their official capacities.[2] (*Id.* at 30.) One week later, the Defendants filed their reply brief. (Defs.' Reply (Dkt. 18).)

## II.    Standard of Review

### A. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). In reviewing a motion to dismiss for failure to state a claim, the court must consider the facts from the complaint as true and "draw all reasonable inferences in favor of the plaintiff." *Iqbal*, 556 U.S. at 678; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). The court's review is generally limited to the complaint itself as well as documents attached to the complaint or incorporated into the complaint by

---

[2] Although the case caption of the amended complaint suggests that Hatter brings his claims against Hill and Wilson in their official and personal capacities, (Am. Compl. at 1), Hatter certifies in his response brief that he is only suing these Defendants in their individual or personal capacities, (Pl.'s Br. at 30). Accordingly, the court will only analyze each claim against Hill and Wilson as a personal-capacity claim.

reference. Fed. R. Civ. P. 12(d), 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### B. Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over a complaint. *See* Fed. R. Civ. P. 12(b)(1). Here, the Defendants bring a facial challenge to subject matter jurisdiction, as they "contend that [the] complaint simply fails to allege facts upon which subject matter jurisdiction can be based" for any claims against the Nelson County Sheriff's Office. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal quotation marks omitted). When resolving a Rule 12(b)(1) facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

### III.    Analysis

### A. Fourth Amendment Claims Against Wilson (Counts I & II)

The Fourth Amendment declares that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Hatter brings his Fourth Amendment claims under 42 U.S.C. § 1983, which authorizes a citizen to pursue a civil action against a person acting under color of state law who deprived them of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must plausibly allege (1) "the violation of a right secured by the Constitution and laws of the United States," and (2) "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

A public employee like Wilson generally acts under color of state law while he is "exercising his responsibilities pursuant to state law." *Id.* at 50. When carrying out the traffic stop and detention of Hatter, Wilson was clearly acting pursuant to his official deputy sheriff duties as required by the "under color of law" element of § 1983. But to survive Defendants' motion to dismiss on Counts I and II, Hatter must also plausibly allege the other § 1983 element for each count—that Wilson violated his Fourth Amendment rights by executing an unreasonable seizure and an unreasonable search. (*See* Am. Compl. ¶¶ 94–119.)

1. Underlying Seizure (Count I)

Hatter contends that Wilson violated the Fourth Amendment by continuing to keep Hatter in custody for hours following receipt of the 0.00 breathalyzer results. (*See* Am. Compl. ¶¶ 94–108; Pl.'s Br. at 2–5, 19–20.) The court concludes that Hatter's unreasonable seizure claim against Wilson will survive the motion to dismiss, as Hatter adequately alleges that Wilson lacked probable cause to continue detaining him after the results.

The Fourth Amendment forbids law enforcement officers from making "unreasonable seizures," or seizures "effected without probable cause." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996). An individual has been "seized" within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This includes when the person's "freedom of movement is restrained" by "means of physical force or a show of authority." *Id.* at 553. It is apparent and uncontested that, from the moment Hatter was pulled over on the evening of June 25 to the moment he was released from custody around 3:30 a.m. the following morning, he was

seized for purposes of the Fourth Amendment.  (*See* Am. Compl. ¶¶ 97–101.)  Thus, the analysis of the seizure claim turns on whether Hatter adequately alleged that Wilson's continued detention of Hatter after obtaining the breathalyzer results was not supported by probable cause.

Hatter contends that, beginning at 11:45 p.m. when Wilson received the results, Wilson did not have probable cause to believe that Hatter was guilty of driving under the influence of an intoxicating substance.  (Am. Compl. ¶¶ 97–98, 101.)  Hatter does not challenge the initial traffic stop or his warrantless arrest; he only argues that probable cause dissipated after the breathalyzer results.[3]  (*Id.* ¶ 97.)  Probable cause is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  This "totality-of-the-circumstances" inquiry, *Gates*, 462 U.S. at 230, is based on the "facts and circumstances within [an officer's] knowledge and of which they had reasonably trustworthy information," *Carroll v. United States*, 267 U.S. 132, 162 (1925).  Probable cause requires "less than that evidence necessary to convict."  *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998).  However, it requires "more than bare suspicion."  *Id.*

---

[3] The court notes that other circuits have adopted a distinct standard for determining whether, following a legal warrantless arrest based on probable cause, an affirmative duty to release the arrestee arises.  *See Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986); *McConney v. Houston*, 863 F.2d 1180 (5th Cir. 1989).  Under their approach, which is based on the standard articulated in the Restatement Second of Torts, an officer's duty to release arises "only if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded."  *Thompson*, 798 F.2d at 556.  The Fourth Circuit has not expressly adopted this standard, nor did the parties brief this issue.  But even if the standard is applicable to this case, at this early motion to dismiss stage, the record is insufficient to determine whether Wilson had "ascertain[ed] beyond a reasonable doubt" that probable cause had dissipated.  *Id.*

A probable cause determination also centers on two factors: (1) "the suspect's conduct as known to the officer," and (2) "the contours of the offense thought to be committed by that conduct." *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). The offense at issue here is driving a motor vehicle while intoxicated. Va. Code Ann. § 18.2-266. Specifically, Virginia law prohibits driving a car while under the influence of alcohol, any "self-administered intoxicant or drug of whatsoever nature," or "the combined influence of alcohol and . . . drugs to a degree which impairs [one's] ability to drive." *Id.* For cases involving alcohol, it is unlawful to drive a car with a blood alcohol content ("BAC") of 0.08 or higher or while otherwise "under the influence." *Id.* Thus, to have had probable cause for Hatter's seizure, Wilson needed to reasonably believe that Hatter was driving while under the influence of alcohol, other intoxicants, or both.

Virginia law establishes that any person "who operates a motor vehicle upon a highway . . . in the Commonwealth shall be deemed thereby, as a condition of such operation, to have consented" to a breathalyzer test "within three hours of the alleged offense." *Id.* § 18.2-268.2(A). Although breathalyzer test results are not generally admissible as evidence supporting a conviction, *id.* § 18.2-267, they have long been a permissible factor in determining probable cause for "driving while intoxicated" offenses. *See Jones v. Town of Marion*, 508 S.E.2d 921, 923 (Va. Ct. App. 1999), *aff'd*, 524 S.E.2d 866 (Va. 2000) ("The function of the preliminary breath test under [Virginia] Code § 18.2–267 is to provide an independent means to determine and resolve questions concerning probable cause . . . ."); *Clem v. Jenkins*, No. 3:18-cv-00049, 2019 WL 181124, at *4 (W.D. Va. Jan. 11, 2019) ("By providing in Code § 18.2-267 that the officer may charge an individual with driving while intoxicated on the basis of the results of a

preliminary breath test, the legislature has recognized that this test is reasonably trustworthy to show that a person has consumed alcohol for purposes of determining whether probable cause exists to make an arrest." (quoting *Stacy v. Commonwealth*, 470 S.E.2d 584, 586 (Va. Ct. App. 1996))).

Courts have also found that breathalyzer results of zero may help dispel an officer's suspicions that an individual was driving under the influence of *alcohol*. *See Kubisiak v. Gualtieri*, 723 F. Supp. 3d 1154, 1169 (M.D. Fla. 2024) (finding that even if initial roadside arrest for DUI was lawful, "probable cause to continue Plaintiff's detention would have dissipated when she twice blew 0.00% BAC" because the alleged indicators for probable cause related to alcohol use); *Butler v. City of Richardson*, No. 3:95-cv-00533, 1997 WL 135651, at *4 (N.D. Tex. Mar. 14, 1997) ("These assertions are insufficient to support a finding that, as a matter of law, probable cause existed to detain Butler after two breathalyzers had registered 0.00% blood alcohol . . . ."); *Babers v. City of Tallassee*, 152 F. Supp. 2d 1298, 1307–09 (M.D. Ala. 2001) (holding a reasonable jury could conclude that plaintiff's 0.00 breathalyzer results "provided [the officer] with information that proved beyond a reasonable doubt that his initial probable cause determination that Plaintiff was driving under the influence of alcohol was unfounded").

Since a breathalyzer only screens for alcohol, a result of zero does not necessarily refute an officer's probable cause that the arrestee was driving under the influence of other intoxicating substances, like drugs. *See Williams v. O'Conor*, No. 1:18-cv-2723, 2020 WL 6218767, at *4 (D.S.C. Jan. 30, 2020). On the other hand, a result of zero does not automatically provide an officer with probable cause that the driver was in fact under the influence of drugs. Once it becomes clear that an individual was not under the influence of

alcohol, the officer still needs probable cause that the individual was impaired by substances other than alcohol to justify detention. *See Butler*, 1997 WL 135651, at *4 (holding that an officer no longer had probable cause to continue testing for other intoxicating substances after breathalyzer tests revealed a 0.00% blood alcohol level); *Kubisiak*, 723 F. Supp. 3d at 1169 (holding that "in order to have probable cause for Plaintiff's continued detention" after a breathalyzer showed her BAC was 0.00%, "the totality of the circumstances known to [the officer] must have been such that a reasonable officer could believe there was a substantial chance Plaintiff was impaired by drugs"); *Babers*, 152 F. Supp. 2d at 1311 (M.D. Ala. 2001) (holding that evidence of failing two field sobriety tests and a horizontal gaze nystagmus test was not enough for probable cause to arrest plaintiff for driving under the influence of a controlled substance).

Wilson argues that he had probable cause to continue detaining Hatter after the breathalyzer, as he believed Hatter could be under the influence of drugs.[4] (Defs.' Br. at 20, 23.) But the alleged facts supporting Wilson's suspicions of Hatter's drug use are sparse. First, neither Hatter's statement about drinking seven *beers* nor Wilson's perception of an *alcoholic* beverage odor insinuates that Hatter was under the influence of an intoxicating substance *other than alcohol*. (Am. Compl. ¶¶ 11, 13; Aff. for Search Warrant at 2.) Second, nothing in the complaint suggests that Wilson observed any characteristics of Hatter or obtained any evidence throughout the traffic stop and detention insinuating that Hatter was under the influence of drugs rather than alcohol, such as the odor of marijuana or presence of drug

---

[4] Wilson's affidavit noted that, after the breathalyzer test, he suspected that Hatter may be under the influence of "a controlled substance or other forms of alcohol." (Aff. for Search Warrant at 2.) Defendants do not explain the meaning of "other forms of alcohol," and the court is unaware of any types of alcohol that are undetectable through the type of breathalyzer test administered to Hatter.

paraphernalia inside the car.  After the arrest, besides Hatter's test results of 0.00 blood alcohol content, the complaint does not offer any specific reasons that would have led Wilson to believe a substance other than alcohol caused Hatter to fail the walk-and-turn test or exhibit nystagmus.  Thus, the only alleged facts supporting probable cause of drug use and Hatter's detention following the breathalyzer results were Hatter's (1) "nystagmus" in each eye, (2) failure to properly perform the walk and turn as instructed, (3) loss of balance during the tests, and (4) refusal to take a roadside breath test or complete the field sobriety tests.[5]  (Aff. for Search Warrant at 2.)

The reliability of the field sobriety test results may be complicated by other circumstances alleged in the complaint.  Hatter maintains he had a knee injury and footwear that each made it difficult for him to perform the walk-and-turn tests, and he communicated these concerns to Wilson.  (Am Compl. ¶ 29.)  Additionally, the lack of detail surrounding the perceived nystagmus weakens the argument that Hatter was under the influence of some drug or controlled substance.  It is not even clear whether Wilson administered a nystagmus test before documenting this observation in his affidavit.

At this early stage of litigation, and drawing all reasonable inferences in favor of Hatter, the court finds that Hatter has alleged sufficient facts plausibly indicating that Wilson lacked probable cause to continue detaining Hatter for driving while intoxicated after receiving the

---

[5] Virginia state law specifies that any person suspected to be guilty of driving while intoxicated "shall have the right to refuse to permit his breath to be so analyzed, and his failure to permit such analysis shall not be in evidence in any prosecution" for a driving while intoxicated offense. Va. Code. Ann. § 18.2-267.  However, inadmissibility as substantive evidence of guilt does not prevent the officers from considering such a refusal in their probable cause determination.  *See Delph v. Prince William Cnty.*, No. 1:20-cv-01086, 2022 WL 1164005, at *6 (E.D. Va. Apr. 19, 2022) (finding that "plaintiff's refusal to take a roadside breath test" contributed to the overall "sufficient evidence to establish probable cause to arrest plaintiff for driving under the influence"); *Jones v. Commonwealth*, 688 S.E.2d 269, 273 (Va. 2010) (noting that the driver's refusal to perform field sobriety tests contributed to probable cause); *Ramey v. Hartman*, No. 6:19-cv-00003, 2020 WL 1450749, at *5 (W.D. Va. Mar. 25, 2020) (same).

breathalyzer results. Without further factual development, the court cannot affirmatively hold that Wilson possessed or lacked probable cause as a matter of law. *See Novak v. Stuart*, No. 1:22-cv-00010, 2022 WL 3587828, at *5 (W.D. Va. Aug. 22, 2022) ("[P]robable cause determinations are generally more appropriate when the record is fully developed."); *Tobey v. Jones*, 706 F.3d 379, 392 (4th Cir. 2013) ("Probable cause or its absence will be at least an evidentiary issue in practically all cases." (quoting *Hartman v. Moore*, 547 U.S. 250, 265 (2006)) (cleaned up)). Hatter's burden at this point is merely to provide enough detail to "nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. And when, as here, the motion to dismiss is testing the sufficiency of a civil rights complaint, the court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (cleaned up).

Given the lack of Wilson's drug-specific suspicions, the absence of detail surrounding Hatter's nystagmus and performance on the field sobriety tests, and the potential effects of Hatter's alleged injury on the walk-and-turn results, the court finds Hatter has reached this low plausibility bar to assert Wilson lacked probable cause for continued detention and has sufficiently stated an unreasonable seizure claim under Count I.

2. Unreasonable Search Claim (Count II)

Hatter also challenges the blood draw as an unreasonable search. The court concludes that Hatter fails to plausibly allege that Wilson deliberately or recklessly omitted material facts

- 17 -

from his affidavit in his search warrant application. However, Hatter's claim that Wilson lacked probable cause to seek the search warrant in the first place will survive dismissal.

      *i.*    *Franks Challenge*

For Count II, Hatter argues that Wilson subjected him to an unreasonable search without due process of law by "omitt[ing] material information from the affidavit he submitted in support" of his search warrant application.[6] (Am. Compl. ¶¶ 112–16.)

Under Virginia law, any person "who operates a motor vehicle upon a highway . . . in the Commonwealth shall be deemed thereby, as a condition of such operation, to have consented to have samples of his blood, breath, or both blood and breath taken for a chemical test to determine the alcohol, drug, or both alcohol and drug content of his blood, if he is arrested for" driving under the influence. Va. Code Ann. § 18.2-268.2(A). After a person who has been arrested for DUI submits to a breath test, as Hatter did, "he may be required to submit to tests to determine the drug or both drug and alcohol content of his blood *if the law-enforcement officer has reasonable cause to believe the person was driving under the influence of any drug or combination of drugs, or the combined influence of alcohol and drugs.*" *Id.* § 18.2-268.2(C) (emphasis added). Therefore, Virginia law only expressly authorizes blood testing where the officer has "reasonable cause" to believe that the driver was under the influence of drugs.

"It is well established that a drug test, be it a urinalysis test or blood test, is a 'search' within the meaning of the Fourth Amendment." *Hassell v. City of Chesapeake*, 64 F. Supp. 2d

---

[6] In Count II of his amended complaint, Hatter also alleges that "Wilson further lacked probable cause when he requested a subsequent warrant for Mr. Hatter's arrest for driving under the influence of drugs." (Am. Compl. ¶ 116.) However, requesting an arrest warrant is simply a step to obtain authorization for a seizure and a potential search incident to arrest. The request does not itself constitute a search within the meaning of the Fourth Amendment. Therefore, the court only addresses the *seizure* of Hatter during Wilson's application for the arrest warrant in its Count I analysis.

573, 576 (E.D. Va. 1999). The Fourth Amendment generally requires that all searches be supported by a warrant issued by a magistrate and based on probable cause. *See Katz v. United States*, 389 U.S. 347, 357 (1967). In cases where a search was effectuated pursuant to a warrant, there is a presumption that the affidavit supporting an officer's search warrant application is valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). As such, the Supreme Court has warned courts not to "interpret[] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). Nevertheless, an officer "violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or with reckless disregard for the truth makes material false statements or omits material facts." *Miller v. Prince George's Cnty.*, 475 F.3d 621, 631 (4th Cir. 2007) (cleaned up).

Here, Hatter attempts to allege an unreasonable search claim by arguing that Wilson "omitted material information from the affidavit he submitted in support of the warrant for a blood draw so as to secure this search warrant without probable cause." (*See* Am. Compl. ¶ 114.) In *Franks v. Delaware*, the Supreme Court set forth a test for such claims. 438 U.S. 154, 164–72 (1978). Although the test originated in the criminal context, the Fourth Circuit consistently applies it in civil § 1983 actions like this one to ascertain the constitutionality of a search or seizure. *See Evans v. Chalmers*, 703 F.3d 636, 650 (4th Cir. 2012); *Hicks v. Anne Arundel Cnty.*, No. JKB-20-22, 2020 WL 7624773, at *11 (D. Md. Dec. 22, 2020); *Williams v. Wright*, No. 5:20-CT-3131-FL, 2022 WL 17177639, at *2 (E.D.N.C. Nov. 23, 2022). To claim that an affiant improperly omitted facts, the *Franks* test requires the plaintiff to show both that (1) the affiant intentionally or recklessly omitted information in the affidavit; and (2) the omissions

were material.  *United States v. Wharton*, 840 F.3d 163, 168–70 (4th Cir. 2016) (citing *Franks*, 438 U.S. 154).

The *Franks* exception to the presumption of an affidavit's validity is "narrow."  *United States v. Sanders*, 107 F.4th 234, 252 (4th Cir. 2024).  Wilson need not include every detail or fact that may be exculpatory in his affidavit.  *See Evans*, 703 F.3d at 651; *Unus v. Kane*, 565 F.3d 103, 125 (4th Cir. 2009) ("That some contradictory evidence may have been available . . . does not defeat the existence of probable cause.").  The "intentional or reckless" requirement in the *Franks* test is only met if the affiant's omission was "*designed to mislead*" or was made "in *reckless disregard of whether it would mislead*" the magistrate judge.  *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)) (emphasis in original).  If the defendant's omissions are attributable to "negligence or innocent mistake," they do not give rise to a Fourth Amendment violation.  *Miller*, 475 F.3d at 627.

In the present case, Hatter only alleges that Wilson *omitted* material facts; he does not claim that Wilson affirmatively made false statements in the affidavit.  (*See* Am. Compl. ¶¶ 112–15; Pl.'s Br. at 2–5.)  "[T]he affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory," because "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Colkley*, 899 F.2d at 300–01; *see Smith v. Reddy*, 882 F. Supp. 497, 501 (D. Md. 1995) (warning courts of the dangers of imposing "broad liability for omissions in warrant applications").  Unless Hatter "makes a strong preliminary showing that the affiant excluded critical information from the affidavit *with the intent to mislead* the magistrate, the Fourth Amendment

provides no basis for a subsequent attack on the affidavit's integrity." *Colkley*, 899 F.2d at 303 (emphasis added). And merely showing that an officer deliberately omitted a fact from an affidavit does not fulfill the *Franks* requirements, as "the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information." *Tate*, 524 F.3d at 455.

Specifically, the information Hatter claims was improperly excluded from the warrant affidavit is: (1) that Wilson searched Hatter's vehicle and found no incriminating evidence; (2) that Hatter did not admit to drug use; (3) that Hatter "did not feel comfortable performing the walk and turn in the footwear he was wearing"; (4) that Hatter informed Wilson of a knee injury that could impact his ability to perform the sobriety tests; and (5) any facts regarding Wilson's "knowledge of and training in nystagmus, the relevance of nystagmus as it relates to drug or alcohol use, the indications of nystagmus he had observed, or even whether he performed horizontal or vertical nystagmus." (Am. Compl. ¶¶ 27–30.)

In alleging omission with reckless disregard, Hatter relies largely on conclusory statements like "Wilson's acts and omissions show a reckless and callous indifference and disregard for Mr. Hatter's federally protected rights." (*Id.* ¶ 118.) The only facts he references when alleging Wilson's recklessness are (1) Commonwealth Attorney Rutherford's comments about how "you have to get something" demonstrating probable cause before obtaining a blood draw, and (2) Wilson's comments during Ligon's subsequent arrest that nystagmus alone is not enough for a blood draw. (Am. Compl. ¶¶ 113, 117.) But neither of these statements—both of which occurred months after Hatter's detention—tend to show that Wilson withheld

discussion of Hatter's knee injury and footwear complaint, nystagmus details, car search, or lack of drug use admission to mislead the magistrate.

Rutherford's statement is nothing more than a recitation of basic Fourth Amendment law: that probable cause is required before executing a search in the form of a blood draw. And Wilson's nystagmus comment during Ligon's arrest responds to an entirely different set of circumstances than those found in Hatter's case; unlike Hatter, Ligon agreed to take the roadside PBT, had a blood alcohol level of 0.08, and had nystagmus that, according to Wilson's comment, was not particularly bad. (*Id.* ¶¶ 68–70, 75.) Thus, the mere fact that nystagmus was one of several factors contributing to probable cause in Hatter's case does not render Wilson's later assertion to Ligon—"with the nystagmus, I have seen a lot, lot worse, so I don't feel that I have enough to place you under arrest for DUI"—determinative of his intent or state of mind in Hatter's case. (*Id.* ¶ 75.)

Without additional factual allegations, Hatter does not plausibly suggest that Wilson's omissions were anything more than innocent mistakes or byproducts of an officer's inability to include every piece of information gathered in their affidavit. "[N]othing in the omission[s] alleged" by Hatter "plausibly suggests an intent to deceive or recklessness, and thus the asserted omission does not satisfy the first *Franks* prong." *Evans*, 703 F.3d at 651 (finding that affiants' omissions of potentially exculpatory evidence involving a photo array could not serve as basis of *Franks* violation); *see Simmons v. Poe*, 47 F.3d 1370, 1384 (4th Cir. 1995) (finding no attempt to mislead under first *Franks* prong where the affiant omitted facts inconsistent with a suspect's guilt from an affidavit); *Colkley*, 899 F.2d at 299–301 (finding that affiant omitting

- 22 -

fact that six eyewitnesses failed to identify criminal suspect in a photo array did not satisfy the first *Franks* prong).

Accordingly, the court concludes that Hatter fails to plausibly state a claim that Wilson deliberately or recklessly omitted information that misled the magistrate in issuing the blood draw search warrant. The court need not address the materiality of the omissions, as the first *Franks* prong is not sufficiently alleged. *See Unus*, 565 F.3d at 124.

ii.    *Lack of Probable Cause to Seek Search Warrant*

But the *Franks* violation is not the only facet of Hatter's unreasonable search claim. Hatter also broadly alleges that the blood draw cannot be "presumed reasonable due to the intervening Search Warrant" because, "[i]n addition to omitting vital information from the Affidavit, Wilson requested the Search Warrant when no officer of reasonable competence would have done so." (Am. Compl. ¶¶ 49–50.)

In their motion to dismiss, the Defendants almost exclusively rebut Hatter's "theory rest[ing] on alleged omissions in the affidavit"—his *Franks* challenge—when responding to the unreasonable search claim. (Defs.' Br. at 21–23.) Their arguments do not clearly challenge the assertion that, even without a *Franks* violation, the search made pursuant to the warrant was unreasonable. Defendants do, however, argue that Wilson had "ample probable cause to suspect drug impairment," which would "justif[y] the blood draw warrant" and render Wilson's request for the search warrant reasonable. (*Id.* at 20.)

Although "the fact that a neutral magistrate has issued a warrant is the clearest indication that the [police] officers acted in an objectively reasonable manner," an officer like Wilson may nevertheless be liable for executing a search pursuant to a search warrant but

- 23 -

unsupported by probable cause. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (holding

that a warrant doesn't prohibit civil suit against the officer when "it is obvious that no

reasonably competent officer would have concluded that a warrant should issue"); *Gagnon*, 831

F.3d at 182–84. For this particular search warrant to have been supported by probable cause,

there must have been a "fair probability that evidence of [drug use] would be found" in

Hatter's blood sample. *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (cleaned up). That is, even

if Wilson did not deliberately or recklessly omit facts in his affidavit, Wilson's search pursuant

to the warrant could still be unconstitutional. For the same reasons that the court denied the

motion to dismiss as to Count I, Hatter alleges sufficient facts to raise a reasonable inference

that Wilson did not have probable cause to believe that evidence of drug use would be present

in his blood. The court will allow this part of the Count II claim to proceed.

      3.  <u>Wilson's Qualified Immunity Defense</u>

      If Wilson lacked probable cause for Hatter's continued detention and blood draw after

the breathalyzer test, he would nevertheless avoid § 1983 liability if the defense of qualified

immunity applies. Wilson briefly raises a qualified immunity defense as to both the search and

seizure claims in his motion to dismiss. (Defs.' Br. at 23, 25.)

      Under the doctrine of qualified immunity, "government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This

immunity shields "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986). "To establish a qualified-immunity defense, a public

- 24 -

official must demonstrate that (1) a plaintiff has not alleged or shown facts that make out a violation of a constitutional right, or that (2) the right at issue was not clearly established at the time of its alleged violation." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 395–96 (4th Cir. 2014) (cleaned up). The court may choose the order in which they address these two prongs, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and only one must be met for qualified immunity to apply, *see Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005); *see Riddick v. Barber*, 109 F.4th 639, 650 n.5 (4th Cir. 2024) (quoting *Alford v. Cumberland Cnty.*, No. 06-1569, 2007 WL 298529, at *3 (4th Cir. Oct. 15, 2007)) ("[Q]ualified immunity typically is best addressed 'at the summary judgment stage after the facts have been developed through discovery.'"); *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (explaining that the time to rule on qualified immunity "is usually summary judgment and not dismissal under Rule 12"). It is possible to decide qualified immunity at the motion to dismiss stage, but a court may only find that the defense applies when "the face of the complaint clearly reveals the existence of" qualified immunity. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013); *see also Tobey*, 706 F.3d at 387 ("A Rule 12(b)(6) motion to dismiss does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." (cleaned up)). Where the "clearly established" inquiry "requires a more developed record," the court may defer consideration of qualified immunity to allow for further factual development. *See Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 459–60 (W.D. Va. 2021); *Davis v. Keller*, No. 7:23-cv-00593, 2024 WL 4326544, at *7 (W.D. Va. Sept. 27, 2024) ("Finally, to the extent there is any lingering question

of whether Defendants violated a clearly established constitutional right, the court finds that question is premature at this stage, and instead reserves consideration of that question for summary judgment.").

The court declines to rule on the applicability of qualified immunity at this juncture. Wilson may reassert his defense of qualified immunity at the summary judgment stage, at which time the record should be adequately developed for this court to make an informed decision on whether such a defense applies. Accordingly, the court will deny Defendants' motion to dismiss as to Count I. Count II may also proceed, but only insofar as Hatter alleges that the blood draw made pursuant to the magistrate-issued search warrant was unconstitutional. Hatter's claim that Wilson committed a *Franks* violation will be dismissed.

### B. Substantive Due Process Claim Against Wilson (Count III)

Hatter argues that by detaining him for a significant period and forcing him to undergo an involuntary blood draw, Wilson undermined Hatter's liberty interest in bodily integrity and violated his Fourteenth Amendment substantive due process rights. (Am. Compl. ¶¶ 121, 125–26.) The court agrees with the Defendants that the Fourteenth Amendment does not provide the proper framework for analyzing Hatter's claims. Hatter does not oppose this argument.

The Supreme Court has held that "[i]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). The allegations Hatter presents for his substantive due process

claim—that Wilson unlawfully seized and detained Hatter, then initiated the blood draw—fall squarely within the constitutional protections of the Fourth Amendment. In other words, the Fourth Amendment "provides an explicit textual source of constitutional protection against unreasonable searches and seizures." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (cleaned up). Accordingly, the Fourth Amendment is the only actionable ground for relief, and Count III will be dismissed. *Id.*

**C. Supervisory Liability Claim Against Hill (Count IV)**

Hatter does not state a § 1983 claim of supervisory liability against Hill, as he fails to plausibly allege that Hill met the three elements required of a supervisory liability claim. He also falls short of stating a claim under the failure-to-train theory. Accordingly, Count IV will be dismissed.

1. <u>General Supervisory Liability Claim</u>

A supervising law enforcement officer may face § 1983 liability stemming from the unconstitutional conduct of his subordinates. *Jackson v. Brickey*, 771 F. Supp. 2d 593, 602 (W.D. Va. 2011). However, the test for such "supervisory liability" claims is "stringent." *Id.* Pursuant to the "long-recognized principle that there is no doctrine of respondeat superior under § 1983," state officers may only be liable in their individual capacity for "personal wrongdoing or supervisory actions that violated constitutional norms." *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022). To make out a claim of supervisory liability under § 1983, the plaintiff must show:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;

(2) That the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and

(3) That there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 257 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Hatter must first plausibly allege that Hill knew or constructively knew of his subordinates posing a "pervasive and unreasonable risk" of constitutional injury. To fulfill this element, the plaintiff must show that the conduct risking constitutional injury "is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Here, Hatter points to the fact that, after asking Commonwealth Attorney Rutherford if there is "any supervision" at the Nelson County Sheriff's Office, Rutherford replied, "none. None. Yeah, it's bad." (Am. Compl. ¶¶ 89–90.) But this vague response from a singular third party, without any reference to associated facts or actual instances of constitutionally risky conduct, does not raise a reasonable inference that Hill was aware of a widespread risk of constitutional injury. Nor does this comment support a plausible inference that "Sheriff Hill failed to supervise police officers during his entire tenure, which began in 2016," as Hatter claims it does. (Pl.'s Br. at 18.)

Further, Hatter does not cite any other instance where Hill knew or should have known about Wilson or another subordinate conducting an unreasonable search or a prolonged detention unsupported by probable cause. Allegations about Wilson's traffic stop of Jessica Ligon involved different circumstances and different alleged misconduct than that of the Hatter traffic stop (i.e., Wilson releasing Ligon rather than wrongfully detaining her). (*See* Am. Compl. ¶¶ 65–80.) Hatter does not even allege that Wilson posed an unreasonable risk of

harm to Ligon's Fourth Amendment, substantive due process, or other constitutional rights, much less that Hill knew about such a risk. (*See* Am. Compl. ¶¶ 72–73, 77.) Overall, Hatter does not adequately allege that Hill had actual or constructive knowledge that Wilson or any other subordinates posed a pervasive and unreasonable risk of constitutional injury on more than one occasion.

Nor does Hatter plausibly allege that Hill was deliberately indifferent. Deliberate indifference is a high bar, typically marked by a supervisor's "continued inaction in the face of documented widespread abuses." *Shaw*, 13 F.3d at 799 (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). As stated above, Hatter does not allege any sort of pattern of widespread constitutional violations. Nevertheless, Hatter also attempts to show deliberate indifference through a theory of tacit authorization. For this, Hatter points to his speculations that Hill failed to further investigate or discipline Wilson following Hatter's detention, as well as his speculations that Hill reached out to WPD and CPD about Hatter's access to CAD. (Am. Compl. ¶¶ 133–38.)

First, failure to respond or investigate after the single incident at issue took place does not give rise to supervisory liability under § 1983. *See Danser v. Stansberry*, 772 F.3d 340, 349–50 (4th Cir. 2014) ("A supervisor may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of comparable conduct occurring *before* the incident at issue took place." (emphasis added)). Therefore, to the extent that the claim rests on Hill's failure to investigate Hatter's detention after he was released, this alone cannot give rise to supervisory liability.

Furthermore, the court agrees with Defendants that each of Hatter's allegations regarding Hill's response—the lack of discipline, lack of investigation, and outreach to third parties about CAD—are almost entirely made "on information and belief," without any factual support. (Defs.' Br. at 11; Am. Compl. ¶¶ 136–38.) Although plaintiffs may generally plead facts based "upon information and belief" where the plaintiff "is in a position of uncertainty because the necessary evidence is controlled by the defendant," there are limits on this permission. *Drzymala v. BAE Sys. Controls, Inc.*, No. 7:21-cv-00522, 2022 WL 3971050, at *3 (W.D. Va. Aug. 31, 2022).

Unlike in *Drzymala*, where the court found factual anchors for the allegations made "upon information and belief," Hatter relies purely on speculation to allege that Hill sought to prevent Hatter from using CAD to cover up "additional instances of Deputy Wilson violating individual's [sic] constitutional rights in a similar manner." (Am. Compl. ¶¶ 140–42.) Hatter does not allege facts suggesting even one additional incident in which Wilson violated the Constitution. Nor does he allege facts to anchor his speculative claim that Hill or someone speaking on his behalf communicated with WPD and CPD about Hatter in the first place. (*Id.* ¶¶ 139–40.) Overall, Hatter's allegations are far too speculative to support a plausible inference that Hill's response was so inadequate as to constitute tacit authorization or condonation of unconstitutional conduct. *See Kashdan v. George Mason Univ.*, 70 F.4th 694, 702 (4th Cir. 2023) (affirming dismissal of a claim where the complaint was "devoid of facts supporting the allegations that were pleaded upon information and belief").

Even if the first two elements were met, Hatter's claim would nevertheless fail because he does not allege an "affirmative causal link" between Hill's inaction and the harm that Hatter

suffered. *Shaw*, 13 F.3d at 800. This causation inquiry looks to whether the injury was the "natural consequence of [the officer's] actions." *Id.* To the extent that Hill learned about Wilson's alleged constitutional violations through the June 27 preservation request, or following Ligon's traffic stop, Hatter's constitutional injury could not have been the natural consequence of Hill's inaction, as both events occurred in the days and months following Hatter's traffic stop. This "after-the-fact knowledge is insufficient to state a claim for supervisory liability under § 1983." *Davis v. York Cnty. Bd. of Supervisors*, No. 4:17-cv-00039, 2017 WL 6397833, at *3 (E.D. Va. Sept. 7, 2017), *aff'd*, 707 F. App'x 182 (4th Cir. 2017); *see Smith v. Pauley*, No. 7:21-cv-00457, 2023 WL 1095131, at *6 (W.D. Va. Jan. 30, 2023).

Hatter also claims that Hill may have learned about his arrest while Hatter was still in custody. During his detention, Wilson called who "Hatter believes" was "a supervisor of Deputy Wilson, potentially Sheriff Hill." (Am. Compl. ¶ 32.) On the phone, Wilson explained "Hatter's detention," that he was taking Hatter to the hospital for a blood draw, and that he intended to charge Hatter with DUI of drugs. (*Id.* ¶¶ 32–33.) Again, without any anchor for this speculative allegation that Hill *might* have been the recipient of the call, Hatter's claim does not raise the reasonable inference that Hill was aware of and deliberately indifferent towards conduct that posed an unreasonable risk of constitutional injury. And even if Hill *was* the call recipient, Hatter does not allege that Wilson conveyed facts sufficient to inform Hill that he posed a risk of constitutional injury in Hatter's case alone—much less on several different occasions, as required by the pervasive risk element of supervisory liability.

2. Failure-to-Train Claim

- 31 -

Hatter also alleges that Hill faces supervisory liability because he "failed to provide any training to Deputy Wilson so as to avoid unconstitutional seizures, detentions, or searches like those inflicted upon Mr. Hatter." (Am. Compl. ¶ 145.) Hatter seeks to establish a "single-incident failure to train claim." (Pl.'s Br. at 15.) To hold a supervisor liable for failure to train subordinates, Hatter must plead and prove that:

> (1) the subordinates actually violated the plaintiff's constitutional or statutory rights;
>
> (2) the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the person with whom the subordinates come into contact; and
>
> (3) this failure to train actually caused the subordinates to violate the plaintiff's rights.

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989)).

The Supreme Court has held that for a supervisor to be liable under § 1983 for failure to train subordinates, the defendant must be deliberately indifferent to the constitutional rights of individuals like the plaintiff. *City of Canton*, 489 U.S. at 388. Specifically, the need for more or different training must have been "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the supervisor "can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Hatter contends that deliberate indifference is supported by the fact that he, a man with law enforcement experience, believes it was obvious that Wilson should not have sought an arrest warrant for driving under the influence of drugs without additional evidence. (Pl.'s Br. at 15.) But this clearly does not suffice to allege an "obvious" need for training. Hatter cannot rely on his own belief about the validity

of his constitutional claims to show that Hill's training was obviously inadequate and that the sheriff's office needs different or more training.

Nor is it enough that Commonwealth Attorney Rutherford expressed to Hatter that Wilson should not have attempted to charge Hatter with driving under the influence of drugs. First, although Hatter alleges that he and Rutherford "discussed Mr. Hatter's arrest" prior to this statement, (Am. Compl. ¶ 86), it is unclear whether Rutherford knew all the facts available to Wilson at the time of Hatter's arrest and detention. Even if he did, Rutherford's comments that Wilson needed to obtain more evidence and wait until the blood work was returned before seeking the arrest warrant do not suffice to raise a reasonable inference that Hill knew or should have known that there was an *obvious* need for more or different training. Although courts allow for claims based on single-incident cases, the deliberate indifference standard still requires that the "municipality either knew or should have known about the deficiency, so it could remedy that deficiency." *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), *as amended* (June 10, 2020). Hatter does not allege that anything put Hill "on earlier notice of the need to better train [his] officers," and the high bar for deliberate indifference is not met. *Id.*

To bring a failure-to-train claim, the plaintiff is also required to plead a "specific deficiency" rather than a "general laxness or ineffectiveness in training." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). The plaintiff must allege "a sufficiently close causal link" between the specific training deficiency and the "specific violation." *Id.* In other words, the inadequate training must have made the occurrence of the specific violation "almost bound to happen," not just "likely to happen." *Id.* (cleaned up); *see City of Canton*, 489 U.S. at 388–89

(requiring that plaintiff show that the failure to train was the "moving force behind the constitutional violation").

Hatter underscores Wilson's apparent admission during Ligon's traffic stop "that nystagmus cannot support probable cause to arrest someone for DUI" and contrasts it with Wilson's use of nystagmus in Hatter's case. (Am. Compl. ¶¶ 146–47.) He cites this as evidence of "inconsistent standards as to what constitutes probable cause," and argues that this inconsistency demonstrates Hill's failure to train his subordinates. (*Id.* ¶ 147.) These allegations do not suffice to show a specific deficiency in the training program. First, Hatter alleges no facts about Hill's actual training program. Second, Wilson's nystagmus comment does not necessarily convey a deficiency. Wilson's consideration of nystagmus in Ligon's case need not be precisely the same as in Hatter's case, as probable cause is developed based on a totality-of-the-circumstances analysis in each individual case. *See Gates*, 462 U.S. at 230. Lastly, even if Wilson had employed an inconsistent standard to weigh evidence of nystagmus in Hatter and Ligon's cases, Hatter still does not allege a sufficiently close causal link between deficient training and the alleged constitutional violations, or facts raising a reasonable inference of Hill's deliberate indifference towards the alleged inadequate training.

In sum, Hatter does not allege sufficient facts to support a plausible inference that Hill was deliberately indifferent towards one or more of his subordinate's constitutional violations, or that he was deliberately indifferent towards inadequate training of his subordinates. If a plaintiff fails to allege that an official has violated his constitutional right, the official "is hardly in need of any immunity and the analysis ends right then and there." *Evans*, 703 F.3d at 646. Because Hatter has not sufficiently alleged that Hill committed a constitutional rights violation

under the § 1983 supervisory liability theory, this court will not proceed to the qualified immunity defense analysis for this claim.  Count IV will be dismissed.

### D. Municipal Liability Claim (Count V)

In his amended complaint, Hatter brings Count V, a claim alleging "municipal liability" under § 1983, against the Nelson County Sheriff's Office and Hill.  (Am. Compl. ¶¶ 160–88.) The municipal liability claims against both Defendants will be dismissed.

*First*, the Sheriff's Office is "not a cognizable legal entity separate from the Sheriff in his official capacity and the county government of which this 'office' is simply an agency." *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870 (4th Cir. 1989); *see Vyas v. Hutcheson*, No. 7:23-cv-00738, 2025 WL 918168, at *1 (W.D. Va. Mar. 26, 2025) (collecting cases holding that a sheriff's office is not subject to suit separate from the sheriff); Fed. R. Civ. P. 17(b).  Moreover, a defendant must be a "person" to be subject to suit under § 1983.  *See* 42 U.S.C. § 1983 (specifying that "[e]very *person* who" deprives individuals of rights secured by the Constitution and federal laws may be liable (emphasis added)); *West*, 487 U.S. at 48.  Courts, including this one, have repeatedly held that a sheriff's office is not a "person" for purposes of § 1983.  *See Young v. Perry*, No. 4:16-cv-00060, 2017 WL 836036, at *3 (W.D. Va. Mar. 2, 2017); *Vyas*, 2025 WL 918168, at *1; *Scarberry v. Tazewell Cnty. Sheriff's Off., K-9 Div.*, No. 7:24-cv-00489, 2025 WL 1805330, at *1 (W.D. Va. June 30, 2025); *Moon v. Roanoke City Sheriff Off.*, No. 7:21-cv-00607, 2022 WL 1912778, at *1 (W.D. Va. June 3, 2022).  Accordingly, the § 1983 claim of "municipal liability" against Nelson County Sheriff's Office will be dismissed.[7]

---

[7] Hatter does not oppose the dismissal of his claim against the Nelson County Sheriff's Office.  *See Borromeo v. Mayorkas*, No. 1:22-cv-00289, 2023 WL 2249966, at *5 (E.D. Va. Feb. 27, 2023) ("A party's failure to respond to an argument made in a motion to dismiss constitutes a concession of that argument.").

*Second*, Hatter fails to state a claim of "municipal liability" under § 1983 against Hill in his individual capacity. Hatter's amended complaint includes a series of allegations similar to those in Count IV's supervisory liability claim: that Hill (1) had "a policy of ignoring complaints against Deputy Wilson," (2) "condoned or encouraged a known pattern of conduct by Deputy Wilson that was blatantly unconstitutional," and (3) "failed to promulgate or enforce any sufficient policy, training program, procedure or supervisory protocol that would serve to guard against, address, remedy, or prevent" violations like those Hatter alleged. (Am. Compl. ¶¶ 172–73.)

A *Monell* claim seeks to hold a municipality liable under § 1983. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). But a claim against a defendant in his individual capacity—which is the only type of claim Hatter pursues against Hill, (Pl.'s Br. at 30)—seeks to impose liability on that person, not their government employer. *See Doe #1 v. Montgomery Cnty. Bd. of Educ.*, No. 21-cv-00356, 2021 WL 6072813, at *9 (D. Md. Dec. 23, 2021). A few district court cases in the Fourth Circuit seem to suggest sheriffs could be held liable in their personal capacity under the theory of municipal liability.[8] *See Lloyd v. Morgan*, No. 4:14-cv-00107, 2015 WL 1288346, at *6 (E.D. Va. Mar. 20, 2015) ("A sheriff can be liable under Section 1983 if [he or she] causes such a deprivation through an official policy or

---

[8] For several of the cases Hatter cites as evidence that sheriffs can be held liable under a § 1983 municipal liability theory in their individual capacity, his interpretation is mistaken. (Pl.'s Br. at 11–12.) In *Wyatt v. Mondul*, the defendant argued that plaintiff's claim that a sheriff implemented an unconstitutional policy or procedure "is actionable only against the municipality." No. 4:24-cv-00049, 2025 WL 2043378, at *7 (W.D. Va. July 21, 2025). Rather than affirmatively imposing municipal liability on the sheriff, the court simply rejected defendant's argument, explaining that "*individual* liability on the implementing official is permitted." *Id.* (emphasis added). The court proceeded to conduct § 1983 supervisory liability analysis. Similarly, in *Gordon v. Schilling*, the Fourth Circuit merely held that an individual may be subject to a personal-capacity *supervisory* liability claim for unconstitutional policymaking decisions—specifically, for being deliberately indifferent towards the plaintiff's medical condition while serving as chief physician for the Virginia Department of Corrections. 937 F.3d 348, 362 (4th Cir. 2019).

custom." (cleaned up)); *Jenkins v. Woody*, No. 3:15-cv-00355, 2017 WL 342062, at *11 (E.D. Va. Jan. 21, 2017); *Skeen v. Washington Cnty. Sheriff's Off.*, No. 1:20-cv-00017, 2020 WL 6688550, at *4 (W.D. Va. Nov. 12, 2020) ("Sheriffs may also be held liable pursuant to § 1983 under the theory of municipal liability for instituting a policy or custom that causes a constitutional violation.").

Conversely, many other district courts in the Fourth Circuit have found that "[b]ecause *Monell* suits are ultimately intended to hold municipal entities liable, they cannot be brought against individuals in their personal capacities." *Winfree v. Hill*, No. 3:21-cv-00039, 2022 WL 2812057, at *4 (W.D. Va. July 18, 2022) (quoting *Montgomery Cnty. Bd. of Educ.*, 2021 WL 6072813, at *9); *see, e.g.*, *Grim v. Baltimore Police Dep't*, No. ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019) ("If *Monell* is limited to municipal entities and personal-capacity suits concern individuals, it follows that a *Monell* claim cannot lie against a municipal official sued in his individual capacity."); *King v. Blackwood*, No. 1:21-cv-00383, 2023 WL 4163141, at *11 (M.D.N.C. June 23, 2023), *report and recommendation adopted*, No. 1:21-cv-00383, 2023 WL 4902517 (M.D.N.C. Aug. 1, 2023); *Devi v. Prince George's Cnty.*, DKC 16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017) ("Plaintiff cannot state a *Monell* claim against an officer in his individual capacity.").

While it does not appear that the Fourth Circuit has directly weighed in on whether a municipal liability claim may be brought against an individual in their personal capacity, the court has implied that it may not. Specifically, the Fourth Circuit held that "[a] state official can be [held liable] in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." *King v. Rubenstein*, 825 F.3d 206, 223 (4th

Cir. 2016); *see also Randall v. Prince George's Cnty.*, 302 F.3d 188, 193 n.4 (4th Cir. 2002) ("A *Monell* claim asserts § 1983 liability against a municipal or county government."). Where, as here, "the only . . . claims are against a public official in [his] individual capacity, to hold the official liable for [a] subordinate's conduct, that 'conduct must meet the test for *supervisory* liability.'" *Dawkins v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (quoting *Mikkelsen v. DeWitt*, 141 F. App'x 88, 90 (4th Cir. 2005)) (emphasis added). Relying on these Fourth Circuit cases, the Western District of Virginia has held that "policy or custom" claims against a sheriff sued in his individual capacity should be dismissed. *See Hairston v. Allen*, No. 7:19-cv-00328, 2020 WL 1066342, at *8 (W.D. Va. Mar. 5, 2020).

Moreover, courts in other circuits have expressly held that the *Monell* municipal liability theory is inapplicable to personal-capacity suits against an officer. *See, e.g., Wilson v. Civil Town of Clayton*, 839 F.2d 375, 382 (7th Cir. 1988) ("Because personal-capacity suits are really suits against the official as an individual, not against the government entity, *Monell* is always inapplicable."); *Lepre v. Lukus*, 602 F. App'x 864, 869 n.4 (3d Cir. 2015) ("The [district court] appeared to apply the *Monell* test to the § 1983 claims against [the officer]. *Monell*, however, sets forth the test to determine if municipalities, not individuals, can be held liable under § 1983."); *Loggins v. Las Vegas Metro. Police Dep't*, No. 2:14-cv-01743, 2015 WL 770438, at *5 (D. Nev. Feb. 24, 2015) ("To the extent Plaintiff is asserting a *Monell* claim against DOE Corrections Officers in their individual capacities, this claim is not cognizable and is therefore dismissed."); *Kennedy v. Fields*, No. 23-11949, 2024 WL 4057462, at *4 (E.D. Mich. May 14, 2024) ("*Monell* imposes liability on municipalities, not individuals."). Hatter cannot hold Hill liable in his personal capacity under *Monell*. Because Hatter has not sufficiently alleged that

Hill committed a constitutional rights violation under a municipal liability theory, this court need not proceed to assess the qualified immunity defense for Hill. Count V will be dismissed as to both Nelson County Sheriff's Office and Hill.

### E. False Imprisonment Claim (Count VI)

Finally, Hatter asks this court to exercise supplemental jurisdiction over a state law tort claim of false imprisonment against Wilson. Virginia common law defines false imprisonment as "the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). Probable cause is one such legal excuse; the presence of probable cause generally defeats a claim of false imprisonment. *Strozier v. Town of Blacksburg*, No. 7:21-cv-00072, 2021 WL 5236871, at *2 (W.D. Va. Nov. 10, 2021); *Jackson*, 771 F. Supp. 2d at 605. But "unlike in an action for malicious prosecution, neither malice nor the lack of probable cause is an element of the tort of false imprisonment." *Dill v. Kroger Ltd. P'ship I*, 860 S.E.2d 372, 381 (Va. 2021).

In fact, "a warrant procured without probable cause does not give rise to a cause of action for false imprisonment when it is regular on its face." *McPhearson v. Anderson*, 873 F. Supp. 2d 753, 759 (E.D. Va. 2012) (quoting *Coughlan v. Jim McKay Chevrolet Inc.*, 18 Va. Cir. 265, 266 (1989)) (cleaned up). Thus, even if an officer obtains an erroneous warrant "maliciously and without probable cause," he is not liable for false imprisonment. *Motley v. Va. Hardware & Mfg. Co.*, 287 F. Supp. 790, 792 (W.D. Va. 1968); *see Cole v. Eckerd Corp.*, 54 Va. Cir. 269 (2000) ("A warrant regular on its face does not give rise to a cause of action for false imprisonment even though the warrant was procured without probable cause." (cleaned up)). This is notably different than the standard for § 1983 unreasonable search or seizure liability,

under which an officer is *not* automatically shielded from liability when a magistrate issues a facially regular warrant. *See Malley*, 475 U.S. at 341. Virginia law does, however, provide a good-faith defense for officers who are able to show: (1) that the officer possesses a subjective belief in good faith that their conduct was lawful, and (2) that such beliefs are objectively reasonable. *Wingate v. Fulford*, 987 F.3d 299, 312 (4th Cir. 2021).

Defendants argue that Hatter's false imprisonment claim must fail because Wilson was acting in good faith and under the authority of a facially valid warrant. (Defs.' Br. at 26–29.) Unlike the arrests in *Lewis v. Kai* and *Dill v. Kroger*, Hatter's initial arrest was not made pursuant to an arrest warrant. However, Hatter does not contest the lawfulness of his initial arrest, and Virginia law permits warrantless arrests based on violations of § 18.2-266, so long as the officer has probable cause that the individual was operating the vehicle while intoxicated. Va. Code Ann. § 19.2-81(D). Therefore, the court will not analyze whether Hatter's initial arrest constitutes false imprisonment.

Instead, Hatter argues that his continued detention following the breathalyzer test amounts to false imprisonment. (Am. Compl. ¶¶ 192–97.) Hatter may be partly correct. But at least a portion of his detention—specifically, the period between the receipt of the magistrate-issued search warrant and the completion of Hatter's blood draw—is attributable to the blood draw carried out pursuant to a search warrant. Hatter does not dispute that Wilson completed the blood draw pursuant to a search warrant that was at least "regular or legal in form." *Motley*, 287 F. Supp. at 792. Therefore, even if Wilson's continued detention of Hatter was not supported by probable cause, the period for which Wilson was executing the search warrant does not constitute false imprisonment. *See Unus*, 565 F.3d at 119–20

(holding that plaintiffs' seizure while defendants were "executing a facially valid search warrant" did not constitute false imprisonment); *Rhodes v. Ingram*, No. 7:13-cv-00192, 2015 WL 5023909, at *11 (E.D.N.C. Aug. 25, 2015) (same).

Thus, the court will dismiss Hatter's false imprisonment claim insofar as it alleges that Hatter was falsely imprisoned during the period between the issuance of the search warrant and the completion of Hatter's blood draw. This seizure was effectuated pursuant to the search warrant, even if Hill lacked probable cause to seek the search warrant in the first place. Furthermore, to the extent that Hatter's false imprisonment claim is based on the alleged *Franks* violation, this portion is dismissed for the reasons set forth above in Section III.A.2.i.

However, the rest of Hatter's false imprisonment claim may proceed. As the court expounds in Section III.A.1, Hatter's allegations support a plausible inference that Wilson, after warrantlessly arresting Hatter, continued to detain him without probable cause following the breathalyzer test. Thus, any period of seizure after receiving the breathalyzer test results and before Hatter was released from custody, except for the period attributable to Wilson's execution of the search warrant, could constitute false imprisonment for the same reasons that Hatter stated a claim of unreasonable search and seizure. Outside of the initial arrest (which Hatter does not challenge) and the execution of the search warrant (which is rendered lawful by the warrant), Hatter sufficiently alleges facts raising the reasonable inference that Wilson restrained Hatter's liberty without sufficient legal excuse of probable cause. *See Jackson*, 771 F. Supp. 2d at 604–05 (denying motion to dismiss a false imprisonment claim for the same reasons that the court denied the motion to dismiss a § 1983 Fourth Amendment claim of unreasonable seizure); *Vollette v. Watson*, 937 F. Supp. 2d 706, 726 (E.D. Va. 2013) ("Claims

for battery and false imprisonment under Virginia law frequently rise and fall with the reasonableness of the arrest/search underlying such claims.").

Further, the Fourth Circuit has interpreted Virginia's "good faith" defense as "congruent with the federal qualified immunity defense." *Wingate*, 987 F.3d at 312. For the same reasons the court declined to grant qualified immunity at this stage, it will not dismiss the remaining portions of Hatter's false imprisonment claim under Rule 12(b)(6) on the grounds of a good-faith defense.

## IV.    Conclusion

For the foregoing reasons, the court will grant in part and deny in part Defendants' motion to dismiss. (Dkt. 15.) The court will deny the motion to dismiss as to Count I. The court will grant in part and deny in part the motion to dismiss as to Counts II and VI. Both Counts II and VI will be dismissed without prejudice to the extent that Hatter brings a *Franks v. Delaware* challenge, alleging that Wilson made materially misleading omissions in his affidavit. Moreover, Count VI's assertion of false imprisonment during the period in which Wilson executed the search warrant will be dismissed. The remaining claims in Count II and VI may proceed.

The court will grant the motion to dismiss as to Counts III, IV, and V. Counts III and V will be dismissed with prejudice. Count IV will be dismissed without prejudice.

An appropriate Order will issue.

**ENTERED** this __10th__ day of February, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE